UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BUFFALO WILD WINGS, INC., | ) | CASE NO. 5:16-cv-1183 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| BW-3 OF AKRON, INC., | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |

Before the Court are the following cross-motions for summary judgment: the motion of defendant BW-3 of Akron, Inc. ("BW-3 Akron") for summary judgment on the claims of plaintiff Buffalo Wild Wings Inc. ("BWW")[1] (Doc. No. 58 ["BW-3 Akron Mot."]), and the motion for summary judgment of BWW on the counterclaims of BW-3 Akron and its co-counterclaimants[2] (Doc. Nos. 59/69 [together, "BWW Mot."]). Both motions are fully briefed[3] and ripe for determination.[4] For the reasons set forth herein, BW-3 Akron's motion is denied, and BWW's motion is granted.

---

[1] BWW's claims are set forth in the amended complaint: Count I for declaratory judgment; Count II for federal trademark infringement under 15 U.S.C. § 1114; and Count III for federal unfair competition under 15 U.S.C. § 1125(a)(1). (Doc. No. 8 ["FAC"].)

[2] The counterclaims are set forth in the amended answer/amended counterclaim: Count I for breach of contract (right of first refusal); Count II for breach of contract (wrongful termination); and Count III for unfair competition (malicious litigation). (Doc. No. 30 ["Countercl."].) Several individuals have joined BW-3 Akron as counterclaimants: Shirley K. Bord, individually and as Executrix of the Estate of William C. Bord, Frederick Bord, Harry L. Bord, and Louise E. Hagstrom. The counterclaim fails to identify any of these individuals, but the record shows that they are siblings who are the current majority shareholders of BW-3 Akron.

[3] The primary briefs include the memoranda supporting each motion, plus opposition briefs (Doc. No. 95 ["BW-3 Akron Mot. Opp'n"] and Doc. No. 96 ["BWW Mot. Opp'n"]) and reply briefs (Doc. No. 101 ["BW-3 Akron Mot. Reply"] and Doc. No. 100 ["BWW Mot. Reply"]). There are also a very large number of documents filed in support of the various briefs, including deposition transcripts. (Doc. Nos. 54, 60, 61, 62, 63, 64, 65, 66, 67, 68, 79, 81, 87, 88, 89, 90, and 91.)

[4] BW-3 Akron filed objections (Doc. No. 106) to certain supportive materials included in BWW's opposition brief (Doc. No. 95). BWW filed an opposition to these objections (Doc. No. 108), and BW-3 Akron filed a reply (Doc. No.

# I. INTRODUCTION [5]

BWW is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. From its origins in 1982, with a single restaurant in Columbus, Ohio, BWW now owns, operates, and franchises over 1,000 casual sports bar restaurants in the United States, Canada, Mexico, and the Philippines, which are known for BWW's signature Buffalo, New York-style wings and sauces and the neighborhood atmosphere offering extensive multi-media systems for viewing sporting events. (FAC ¶¶ 1, 10, 11.)

BW-3 Akron is an Ohio corporation with its principal place of business in Akron, Ohio. (*Id.* ¶ 2.) In 1991, BW-3 Akron entered into a licensing agreement (Doc. No. 71-1 [the "Agreement"][6]) with BWW's predecessor, JMS Associates, Inc. for the right to operate a single Buffalo Wild Wings restaurant at 456 East Exchange Street in Akron, Ohio (the "Akron Store"). (*Id.* ¶¶ 15, 17.) In June 1997, JMS Associates, Inc., fka bw-3,[7] was merged into what is now known as BWW, and BWW acquired the rights of JMS Associates under the Agreement. (*Id.* ¶ 16.) BW-3 Akron's was the oldest continuously operated restaurant and the only one that was a licensed restaurant rather than a corporate or franchise restaurant. (Countercl. ¶ 9.)

---

109). BWW argues that the objections were untimely and should be stricken. (*See* Doc. No. 108, citing *Cleveland Clinic Health Sys.-E. Region v. Innovative Placements, Inc.*, No. 1:11-CV-2074, 2012 WL 1945609, at *1 (N.D. Ohio May 30, 2012) (denying motions to strike construed as Rule 56(c)(2) objections because they were not filed within the summary judgment timelines set by the court).) Rule 56(c)(2), however, sets no specific deadline for objections. Therefore, these briefs have been considered, but the Court perceives no need to rule specifically with respect to each individual objection as the Court will consider only evidence that is proper under the rule.

[5] Neither party provided much by way of background. Therefore, this introductory information has been gleaned from the pleadings and evidentiary material submitted in conjunction with the cross-motions, despite the fact that, at the summary judgment stage, reliance on allegations in the pleadings alone would be insufficient. The information in this section is purely for context.

[6] The Agreement was also attached to the FAC (Doc. No. 8-1); however, for ease of reference, all page citations to the Agreement herein will be to the copy attached to BWW's motion. (Doc. No. 71-1.)

[7] The Agreement refers to "Buffalo Wild Wings and Weck restaurants" as "BW-3 Stores." This should not be confused with defendant, BW-3 Akron.

BWW claims to have made significant investments in, among other things, the distinctive appearance and design of its restaurants, in order to ensure a consistent and widely recognized look and a positive customer experience. (FAC ¶ 12.)[8] It also claims that the goodwill arising from this customer experience is reflected in the BWW trademarks under which its various restaurant services are offered. (*Id.* ¶ 13.)

The current dispute between the parties appears to have had its origin primarily (although not exclusively) in BW-3 Akron's refusal to comply with BWW's demand to remodel the Akron Store (*id.* ¶ 66) to bring it into compliance with BWW's evolving brand and design standards, including exterior and interior layout, design and color scheme, signage, decorations, furnishings and materials (*id.* ¶ 40), and, in particular, BW-3 Akron's refusal to remodel to the "Stadia" design (*id*. ¶26), which BW-3 Akron believes is not required under the Agreement.

On April 1, 2016, BWW sent BW-3 Akron a Notice of Default and Opportunity to Cure. (*Id.* and Att. 18.[9]) BW-3 Akron failed (and refused) to cure the default within the requisite 30 days after the notice, and "the parties remain in stark disagreement concerning their rights and obligations under the Licensing Agreement." (*Id.* ¶¶ 73, 75.) On May 17, 2016, BWW sent BW-3 Akron a Notice of Termination of Licensing Agreement, but stated that it was holding termination in abeyance pending resolution by this Court of BWW's declaratory judgment action filed on the same day. (*Id.*, Att. 19.)

---

[8] BW-3 Akron would challenge this assertion, arguing that the consistency is not as pervasive as BWW claims. (*See, e.g.*, BW-3 Akron Mot. at 1850-51.)

[9] The notice identified three aspects of the default under the Agreement: (1) under § 8(B) because BW-3 Akron was insolvent; (2) under § 8(F) for failure to operate using the System that has been developed and to maintain BWW's standard of quality and appearance; and (3) under § 8(E) for failure to use the current Marks and System and to implement the Enhancements, thereby misusing them all and impairing BWW's goodwill. (Doc. No. 8-18.)

## II. DISCUSSION [10]

As a preliminary matter, the Court notes that both parties moved for summary judgment on their opposing party's claims, but neither party moved for summary judgment on its own claims.

In Count I of its FAC, BWW seeks a declaratory judgment that it may immediately and lawfully terminate the Agreement due to BW-3 Akron's refusal to implement BWW's current brand and design standards,[11] which BWW characterizes as a material breach. BWW also asserts Lanham Act claims of trademark infringement (Count II) for BW-3 Akron's use of BWW's Marks and System without compliance with its brand and design standards, an action claimed to be outside the license granted by the Agreement, and for unfair competition (Count III) due to BW-3 Akron holding out its allegedly substandard store as an authorized BWW store, causing confusion among the public and harming BWW's brand.

Instead of awaiting a judicial determination of these issues, BW-3 Akron chose to abandon the Agreement and de-brand the Akron Store, remodel it, and operate it under the name of Gridiron Grill. Additionally, BW-3 Akron and its shareholders filed counterclaims against BWW. They assert a breach of contract due to BWW's alleged failure to honor BW-3 Akron's right of first refusal with respect to certain other restaurants in surrounding counties (Counterclaim I) and for wrongful termination of the Agreement (Counterclaim II). They further allege unfair competition by way of this litigation (Counterclaim III), characterizing it as "malicious litigation" aimed at driving BW-3 Akron out of business as a BWW store by bringing the Lanham Act claims against it and threatening treble damages and attorney fees and costs.

---

[10] Throughout this opinion, any page number references are to the page identification number generated by the Court's electronic docketing system.

[11] Count I also claims that BW-3 Akron is in default of the agreement because of insolvency. (FAC ¶ 79(e).)

A.      **Standard of Review**

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

B.      **Analysis**

   *1.     Declaratory Judgment -- Count I*

In Count I of its complaint, as amended, BWW seeks a declaratory judgment that (1) the Agreement is a valid and enforceable contract; (2) BW-3 Akron's failure and refusal to remodel as demanded by BWW is a material breach of the Agreement; (3) BW-3 Akron's failure and refusal to remodel as demanded by BWW is a default under the Agreement; (4) BW-3 Akron's failure and refusal to adopt and implement certain operational and procedural enhancements to the BWW System is a material breach of the Agreement; (5) BW-3 Akron's insolvency is a default under the Agreement; and (6) because BW-3 Akron has failed to timely cure these breaches and defaults, BWW may immediately terminate the Agreement in its entirety.

In its motion for summary judgment, BW-3 Akron argues that "[t]he parties seem to agree that BWW's declaratory relief claim is now moot." (BW-3 Akron Mot. at 1855.) This argument is based upon BW-3 Akron's apparent abandonment of the Agreement and its having ceased operations as a BWW restaurant. In its opposition brief, BWW agrees that Count I is moot, but *only* if BW-3 Akron will concede that (1) it is limited to the allegations in its counterclaim as pled;

and (2) it will continue to treat the Agreement -- and all of its rights and obligations thereunder -- as terminated. (BW-3 Akron Mot. Opp'n at 6563.) In reply, however, BW-3 Akron makes neither concession (and fails to even address them), arguing only that "BWW effectively terminated the Licensing Agreement in May 2016 when it filed its Complaint notifying [BW-3 Akron] that it no longer had the right to continue using the Marks and that it would hold [BW-3 Akron] liable for treble damages and attorney fees if it continued to do so." (BW-3 Akron Mot. Reply at 7268.)

Given that BW-3 Akron has not conceded that the Agreement is terminated and is no longer effective, including for any future purposes, Count I of BWW's complaint is not moot. Absent these concessions, there is no certainty that BW-3 Akron will not attempt to resume its allegedly wrongful use of BWW's Marks and System. BWW is, therefore, entitled to a judicial determination as to whether BWW has a right to terminate the Agreement.

Although it appears very possible that BWW would prevail on Count I (especially in view of § 8 of the Agreement, dealing with default), neither party asked the Court to construe the contract and/or to grant summary judgment on Count I. Construction of a contract (presuming it is unambiguous) is for the Court,[12] and not the jury. Even so, absent a motion, the Court will not *sua sponte* rule in summary fashion on the declaratory judgment claim in Count I.[13]

---

[12] It is black-letter law that the terms of a written contract control the relationship of the parties to the contract. The Agreement here states that it will be "interpreted and construed under the laws of Ohio." (Agreement at 3782 § 17.) In Ohio, "construction of a written contract is a matter of law for the court." *Action Grp. Intern., LLC v. AboutGolf, Ltd.*, No. 3:10CV2132, 2011 WL 1627943, at *4 (N.D. Ohio April 29, 2011) (citing *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978)). "The primary goal of contract construction is to give effect to the intentions of the contracting parties." *Id.* (citing *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411, 413 (Ohio 1987)). "A contract that is, by its terms, clear and unambiguous requires no real interpretation or construction and will be given the effect called for by the plain language of the contract." *Id.* (citing *Aultman Hosp. Ass'n v. Comty. Mut. Ins. Co.*, 544 N.E.2d 920, 923 (Ohio 1989)). "A contract is ambiguous if its provisions are susceptible to two or more reasonable interpretations." *Id.* (citing *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio Ct. App. 2003)).

[13] The Court notes that "district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citations omitted); *Salehpour v. Univ. of Tennessee*, 159 F.3d 199, 204 (6th Cir. 1998) ("There is no per se prohibition on a district court entering summary

### 2. *Breach of Contract (Wrongful Termination) -- Counterclaim II*

In Counterclaim II, BW-3 Akron asserts generally that BWW had no right to demand that it remodel the Akron Store, that BWW only made that demand in an attempt to coerce BW-3 Akron's shareholders into accepting a reduced buyout price for BW-3 Akron's rights under the Agreement, and that BWW intentionally caused BW-3 Akron's "default" by filing Lanham Act claims aimed at "wrongfully forc[ing] BW-3 Akron to shut the doors of its BWW restaurant under threat that it might possibly be found liable for treble damages and attorney fees if it continued to operate its restaurant under the BWW name." (Countercl. ¶ 28.)

In its own summary judgment motion, BWW argues that BW-3 Akron cannot maintain its action for wrongful termination where, as here, there was no termination. (BWW Mot. at 3756, citing *Wilgus v. Gen. Elec. Co.*, No. 8-87-21, 1990 WL 35381, at *2 (Ohio Ct. App. Mar. 29, 1990) (no claim for wrongful termination where franchise agreement was not terminated but expired on

---

judgment *sua sponte*." (citation omitted)). The notice requirement is typically cited where a court plans to convert a motion to dismiss to one for summary judgment. No such conversion would be required here, where both parties filed summary judgment motions and had the opportunity to make arguments and submit evidence relating to the declaratory judgment claim. "However, even in circumstances where the procedure implemented by the district court did not provide adequate notice to the party against whom summary judgment was granted, [the Sixth Circuit] has upheld the judgment of the district court where the losing party could not demonstrate prejudice; that is, where remanding the case to the district court would merely entail an empty formality with no appreciable possibility of altering the judgment." *Excel Energy, Inc. v. Cannelton Sales Co.*, 246 F. App'x 953, 960 (6th Cir. 2007) (citations omitted) (identifying factors to consider, including whether the would-be prevailing party filed for summary judgment, what issues were contained in the parties' briefs, the factual materials submitted, and whether the would-be losing party itself moved for judgment on the claim to be considered *sua sponte*). Any declaratory judgment in this case would depend upon the Court's construction of the Agreement, and would require only the Agreement itself (presuming it is unambiguous). The Agreement is in the record and BWW has pointed out the provisions that it believes are controlling. (*See* BW-3 Akron Mot. Opp'n at 6548-49.) BW-3 Akron did not avail itself of the opportunity, in its reply brief, to argue to the contrary. In addition, BW-3 Akron actually did move for summary judgment on Count I, although on grounds that it was moot. Courts recognize this as sufficient "notice." *See Sandesh Ltd. v. Rotate Black, Inc.*, No. 1:10-CV-1039, 2011 WL 5276561, at *4 (W.D. Mich. Nov. 2, 2011) (citing *Salehpour*, *supra*, and *First Fin. Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 115 (2d Cir. 1999) ("[A]s long as some party has made a motion for summary judgment, a court may grant summary judgment to a non-moving party[.]")). Although a *sua sponte* ruling on Count I based on construction of the Agreement (which requires no "evidence" per se) might be appropriate, in the interest of notice and opportunity to be heard, the Court will not pursue that route at this juncture since contract construction was only tangentially briefed.

7

its own terms).) In its opposition, BW-3 Akron argues that BWW "repudiated and breached the Licensing Agreement when it filed this action seeking treble damages and attorney fees . . . under the Lanham Act, as if the Licensing Agreement were no longer in full force and effect." (BWW Mot. Opp'n at 6711-12, collecting cases.) In reply, BWW argues that neither the counterclaim, as pled, nor BW-3 Akron's argument point to any remodeling obligation as the basis for the alleged "wrongful" or "constructive" termination. Rather, BW-3 Akron points only to the filing of the Lanham Act claims. (BWW Mot. Reply at 7233-34; 7234 n. 8.)

BWW has the correct view. There was no termination by BWW. As addressed more fully *infra*, BW-3 Akron misapprehends the law relating to BWW's right to pursue its Lanham Act claims. The mere fact that BW-3 Akron made the business decision to voluntarily abandon the Agreement, in light of the potential for Lanham Act damages should BWW prevail on those claims, does not mean that BWW is responsible for the termination, actually or "effectively."

Because there was no termination by BWW and because, as explained below, BWW is entitled to pursue Lanham Act claims despite the existence of the Agreement, BWW is entitled to summary judgment on BW-3 Akron's counterclaim for wrongful termination (Counterclaim II).

    3.    *Lanham Act Claims - Counts II and III*

In its Lanham Act claims, BWW alleges that, due to BW-3 Akron's refusal to remodel, although operating its Akron Store under an otherwise valid licensing agreement, it "[was] not offering a customer experience consistent with BWW's brand and [was] not adhering to the quality standards and specifications in the Licensing Agreement." (FAC ¶ 85.) This use of the Marks and System "while failing to meet BWW's brand standards and specifications has resulted and continues to result in devaluation of the BWW Marks by tarnishing their image and undermining uniformity across the BWW brand[,]" (*id.* ¶¶ 86, 99), and "leaves BWW powerless to control and

8

manage the BWW Marks, its brand image and related goodwill." (*Id.* ¶¶ 87, 100.) BW-3 Akron's "failure and refusal to implement renovations to bring the Akron Store into alignment with the 'Stadia' design [ ] is likely to cause confusion, mistake, or deception as to both the quality and the source of the products and services it offers." (*Id.* ¶¶ 88, 101.) "Specifically, the non-conforming appearance of the Akron Store creates confusion by, among other ways, misrepresenting to consumers that BW-3 Akron's restaurant and offerings are approved products and services of BWW." (*Id.*) BWW alleges that BW-3 Akron's actions "caus[e] damage, injury and irreparable harm to BWW's business, brand, reputation and goodwill." (*Id.* ¶¶ 91, 103.) BWW alleges that BW-3 Akron's violations were "knowing, willful and in deliberate disregard of the rights of BWW." (*Id.* ¶¶ 92, 104.)

BW-3 Akron moves for summary judgment arguing that the Lanham Act trademark infringement claim fails because BWW consented to BW-3 Akron's use of BWW's Marks and System by way of the Agreement (BW-3 Akron Mot. at 1846), and its unfair competition claim fails because it is "highly questionable" that BWW is able to establish either a substantial economic effect on interstate commerce or a likelihood of confusion (*id.* at 1849-50). In fact, BW-3 Akron's entire argument relies upon the fact that it had a valid license agreement, which it believes

completely immunizes it from any Lanham Act claim.[14] (*Id.* at 1851, citing *Norwood Promotional Prods., LLC v. KustomKoozies, LLC*, 835 F. Supp. 2d 685, 699 (S.D. Ind. 2011).)[15]

BWW argues in opposition to BW-3 Akron's motion that the mere continued existence of a valid license agreement does not immunize a licensee from liability under the Lanham Act. (BW-3 Akron Mot. Opp'n at 6553.) The relevant inquiry, according to BWW, is whether the licensee has used the trademarks in a manner not allowed by the license agreement. (*Id.* at 6554, citing, among other cases, *Brennan's Inc. v. Dickie Brennan & Co. Inc.*, 376 F.3d 356, 366-67 (5th Cir. 2004) (allowing plaintiff to pursue Lanham Act claims "for uses *outside of* those contemplated and permitted in the agreement" (emphasis in original)) and *Digital Equip. Corp. v. AltaVista Tech., Inc.*, 960 F. Supp. 456, 476 (D. Mass 1997) ("Since it likely breached its license, ATI cannot use that license as a defense to an action for trademark infringement.").)

---

[14] BW-3 Akron also argues that § 4 of the Agreement (which it quotes only partially, in a manner that suggests a support for its position) requires BWW to hold BW-3 Akron harmless from all Lanham Act claims. That section provides:

> JMS [BWW] represents and warrants that it has good and marketable title to the Marks and the System and JMS' [BWW's] use of any intangible licensed hereunder has not, and there is no reason to believe it will, infringe the rights of any person. JMS [BWW] agrees to defend, indemnify and hold harmless BW-3 Akron, together with its directors, officers, shareholders, employees, successors and assigns, with respect to all patent, trademark and copyright infringement liability or expenses arising out of the use of the Marks and System. BW-3 Akron acknowledges the representations of JMS [BWW] that JMS [BWW] owns the exclusive right, title and interest in and to the Marks and System, and BW-3 Akron will not at any time knowingly do or cause to be done any or think in any way impairing or intending to impair JMS' [BWW's] right, title and interest to the Marks and System. BW-3 Akron agrees it will not represent that it has any ownership interest in the Marks or System and acknowledges that use of the Marks and System shall not create in BW-3 Akron's favor any right, title and interest in or to the Marks and System, except as provided in this Agreement.

(Agreement, § 4, at 3777-78.) The intent of this provision, when read in its entirety, is that BWW would hold BW-3 Akron harmless should some third party assert a claim against BW-3 Akron for its use of trademarks that BWW has represented belong to BWW. This provision is not intended to prevent BWW from enforcing its rights against BW-3 Akron, and, in fact, this provision arguably supports BWW's right to do so.

[15] *Norwood Promotional Products* is a non-precedential case from another district applying Indiana law. Even so, as properly pointed out by BWW, it stands for little more than "the unremarkable proposition that there can be no Lanham Act violation where a licensee 'continue[s] use of the trademark **in accordance with the agreement**.'" (BW-3 Akron Mot. Opp'n at 6560, n.5, quoting *Norwood*, 835 F. Supp. 2d at 899, adding emphasis.)

10

In order to defeat BW-3 Akron's summary judgment motion on the Lanham Act claims, BWW need only raise a genuine issue of fact as to (1) whether BW-3 Akron's use of the trademark was without BWW's consent, or (2) whether BW-3 Akron's unauthorized use likely caused confusion in the marketplace as to the origin or sponsorship of the product. *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1188-89 (6th Cir. 1997). BWW has succeeded in this respect. The record is replete with communications from BWW to BW-3 Akron stating that the refusal to remodel constituted both a breach of the Agreement and a default under the Agreement, and that BWW believed its brand was being harmed by BW-3 Akron. (*See, e.g.*, Ex. 24 [Doc. No. 75-4], Ex. 26 [Doc. No. 76-1], Ex. 27 [Doc. No. 76-2], Ex. 30 [Doc. No. 76-5], Ex. 32 [Doc. No. 77-2], Ex. 57 [Doc. No. 95-16], Ex. 58 [Doc. No. 95-17]; *see also*, J. Schmidt Dep. [Doc. No. 88] at 5361, 5362, 5366, 5370; S. Yatchak Dep. [Doc. No. 79-1] at 4498, 4505, 4513.) A reasonable jury could agree.

BWW is entitled to pursue its claims under the Lanham Act before a fact-finder. Therefore, BW-3 Akron is not entitled to summary judgment on Counts II and III, and these claims will go to trial.

   *4. Malicious Litigation -- Counterclaim III*

In this counterclaim, BW-3 Akron alleges that BWW has engaged in malicious litigation by pursuing a moot declaratory judgment action and two Lanham Act claims. It asserts that "BWW has engaged in unfair competition by filing this malicious litigation in bad faith without any objective basis or probable cause in order to terminate the Licensing Agreement and thereby acquire the rights of BW-3 Akron and the Bord family for free so that BWW can open BWW corporate and franchise restaurants in the counties covered by the Licensing Agreement."

(Countercl. ¶ 41.) BWW moves for summary judgment, arguing that BW-3 Akron cannot show that the lawsuit was objectively baseless.

"Ohio common law recognizes a claim for unfair competition based on malicious litigation." *All Metal Sales, Inc. v. All Metal Source, LLC*, No. 1:10CV2343, 2011 WL 867020, at *2 (N.D. Ohio Mar. 11, 2011) (citing *Water Mgmt. Inc. v. Stayanci*, 472 N.E.2d 715, 715 (Ohio 1984); *Microsoft Corp. v. Action Software*, 136 F. Supp. 2d 735, 740 (N.D. Ohio 2001)). "To successfully establish an unfair competition claim based upon legal action, a party must show that the legal action is objectively baseless and that the opposing party had the subjective intent to injure the party's ability to be competitive." *Am. Chem. Soc. v. Leadscope, Inc.*, 978 N.E.2d 832 (Ohio 2012), syllabus ¶ 1.

Even if the Court were to assume that BWW had some subjective intent to injure BW-3 Akron's competitiveness, BW-3 Akron is not able to show that this action brought by BWW was objectively baseless.

Accordingly, BWW is entitled to summary judgment on Counterclaim III.

*5.    Breach of Contract (Right of First Refusal) -- Counterclaim I*

BW-3 Akron alleges that BWW breached § 11 of the Agreement by failing to offer the Bord Family their contractual right of first refusal ("ROFR") before opening BWW restaurants in Medina, Stark, Portage or Mahoning Counties. (Countercl. ¶ 2.) Section 11 provides:

> 11.    JMS [BWW] and the JMS Shareholders hereby grant to BW-3 Akron a right of first refusal in connection with the opening of any BW-3 Store by JMS [BWW] or any of the JMS Shareholders or a third party in the following counties: Summit, Medina, Stark, Portage and Mahoning. Neither JMS [BWW] nor the JMS Shareholders may open any [BWW] Store nor may any license be granted concerning the System, the Marks or any Enhancements in the designated counties without prior written approval of BW-3 Akron without offering the Bords the opportunity to participate as a

> 50 percent owner in any [BWW] Store upon terms not less favorable than those granted to the Bords with respect to BW-3 Akron.

### a. Statute of Limitations

It is undisputed that claims for breach of a right of first refusal must be brought within 15 years. BWW first argues that this counterclaim is time-barred except as to two stores -- one in Austintown, Ohio and another in Streetsboro, Ohio. (BWW Mot. at 3762.) BW-3 Akron argues in opposition that it also applies to a store in Kent, Ohio that originally opened in 1992, but moved to a new location in 2013. (BWW Mot. Opp'n at 6714.) But BWW is of the view that, within the meaning of § 11 of the Agreement, this restaurant "open[ed]" and its "license [was] granted" more than 15 years before BW-3 Akron's 2014 state court action; it merely relocated to a different address less than one-quarter mile from the original site. (BWW Mot. at 3762, n. 5, citing W. Kressner Aff. [Doc. No. 78-6] ¶¶ 1-5, 11, 13.)[16] BWW argues that the ROFR under § 11 applies only "where there is a new opportunity presented by new franchisees operating new stores, not a mere change of address." (*Id.*) BW-3 Akron argues that, because "[t]he proposed location of a franchise restaurant is a material factor in deciding whether to exercise the right of first refusal[,]" (BWW Mot. Opp'n at 6714), the Bords were entitled to receive prior notice.

BWW has the better view under the language of § 11 of the Agreement. The Kent store was not "opened" or "licensed" when it moved *from* its original location *to* its new location. The opening and the licensing had already occurred years before. It would be different if the franchisee kept the original Kent location and opened a second location a quarter mile away. But that is not what happened here.

---

[16] BW-3 Akron filed an action in state court, but voluntarily dismissed it and brought counterclaims here. "Relation back" to the date of that complaint applies for statute of limitations purposes.

### b. Prima Facie Case

BWW next argues that, with respect to the two restaurants that fall within the statute of limitations, BW-3 Akron is unable to prove all the elements of a breach of contract claim.

BWW claims that BW-3 Akron has "no admissible evidence that BWW, in fact, failed to offer the Bords any opportunity to participate as 50% owners in any store that opened in the Restricted Territory on or after June 18, 1999." (BWW Mot. at 3763.) In a footnote, BWW asserts that "[i]t is likely that BW-3 Akron will offer hearsay evidence of a breach from alleged statements by Bill Bord, but this is insufficient to overcome summary judgment." (*Id*. n.7, citing *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) ("'[E]vidence submitted in opposition to a motion for summary judgment must be admissible. Hearsay evidence . . . must be disregarded.'" (quoting *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997) (alteration in original))).)

As predicted by BWW, BW-3 Akron asserts: "The evidence is that William Bord was in fact interested in having BW-3 Akron be a 50% passive partner in the franchise stores BWW was opening up in these counties. He expressed this interest to his son Kevin Bord." (BWW Mot. Opp'n at 6713, citing K. Bord Dep. [Doc. No. 61] at 1983, 1989, 1993.[17]) BW-3 Akron asserts that this testimony of Kevin Bord regarding statements of the now-deceased William Bord is admissible to rebut BWW's claim that BW-3 Akron had no interest in exercising its right of first refusal. (*Id.* at 6713-14, citing cases.)

---

[17] BW-3's page citations are to the actual deposition page numbers, *i.e.*, pp. 23-24 (which the Court quotes at length below), 48, and 61-62. The Court sees no relevant testimony on pages 48 or 61-62, and BW-3's brief does not indicate line numbers.

During his deposition, Kevin Bord, the son of now-deceased William Bord, was questioned about an October 17, 1997 letter from Sally Smith (then-president and CEO of BWW) to Don Redman[18] (*see* Doc. No. 72-4), which was copied to all of the Bords, stating, *inter alia*:

> 6. <u>Right of First Refusal in Certain Counties</u>. Where bw-3 [BWW] has entered into a Franchise Agreement in the counties named in paragraph 11 of the 1990 agreement, Jim Disbrow has checked with Bill Bord to see if the Bords wished to participate in each store and Bill Bord turned down the opportunity. Jim and Bill verbally agreed that Summit County would be protected, but that bw-3 [BWW] would franchise the other areas unless Bill contacted Jim that the Bords were now interested in franchising. This fully complies with the requirements of paragraph 11 of 1990 Agreement. You will note that paragraph 11 gives bw-3 [BWW] the option of either offering the opportunity to the Bords to participate as a fifty percent owner or getting prior written approval of [BW]-3 Akron.

(*Id.* at 3913.) Ms. Smith was responding to an October 6, 1997 letter from Redman to one Paul Walden (copied to Bill Bord) (Doc. No. 72-3), wherein he was following up with her regarding a previous week's meeting. Therein, Redman stated, *inter alia*:

> 8. Legal Details
>
> * * *
>
> B. Paragraph 11 of the License Agreement will be modified to eliminate BW-3 Akron's (Bord's) participation in all of the counties enumerated in the License Agreement except for Summit County where BW-3 Akron will retain the exclusive rights to any [BWW] activities.
>
> C. The License Agreement gave the right of "first refusal" and up to "50% participation in any [BWW] Entity that went into any of the various counties enumerated in Clause 11 at terms no less favorable than those given to the Bords for the Akron operation". It was my suggestion that this be eliminated from the License Agreement and that the appropriate rights of first refusal, etc. be documented for the records so that this legal matter is "tied up" properly. You agreed with this suggestion as being beneficial to

---

[18] Redman was the husband of one of the original minority shareholders of JMS (who is also a shareholder in BW-3 Akron). (D. Redman Dep. [Doc. No. 64] at 2092-93.) He was a long-time businessman who assisted both his wife and William Bord during, and following, the transition from the JMS management to BW-3 Akron. (*Id.*) It appears that he may have reviewed BW-3 Akron's accounts in the fall of 1997 and made suggestions regarding revisions to the Agreement. (*Id.* at 2096.)

> BW-3 Inc.'s [BWW's] long-term relations with franchisees and other plans that are on the horizon.

(*Id.* at 3910-11.)

When Kevin Bord was asked whether he had "any independent knowledge of any of the facts in [statement 6 in Smith's letter]," he answered "I do not." (K. Bord. Dep. at 1983.) Then he testified as follows:

> Q. Do you have any information to contradict that?
>
> A. The only conversations I would have had on this topic would have been contrary to that assertion, that Mr. Disbrow had not in fact checked with my father before moving ahead with store openings in adjacent areas.
>
> * * *
>
> Q. . . . When was the first time you remember having that conversation with your father?
>
> A. I can't honestly say.
>
> Q. Is there a time frame you can identify?
>
> A. It would have been before 1997. Several years before 1997. There was an ongoing tension between BW-3 corporate and BW-3 Akron.
>
> * * *
> . . . So, I would say somewhere between 1992 and 1997 there were a number of conversations where my father asserted that Mr. Disbrow had not in fact sought his involvement in these other locations. . . .
>
> Q. Your father was aware that there were franchises being opened in the surrounding territory, is that fair to say?
>
> A. I believe it's fair to say.
>
> * * *
>
> Q. Looking back to . . . the second full sentence [in the October 17th letter, paragraph 6], . . . [d]oes that comport with your understanding based on your conversations with your father?

16

> A. No.
>
> * * *
>
> Q. Did your father ever express an interest in opening stores in any of the surrounding territories?
>
> A. Not to me.

(*Id.* at 1983-84.)

Even assuming that there is an applicable hearsay exception that would operate to admit the deposition testimony of Kevin Bord about his father's views on this issue (and BW-3 Akron has pointed to none), the testimony is entirely too vague, as well as non-specific to either the Streetsboro[19] or the Austintown[20] restaurant, for the Court to conclude that a reasonable jury would find it persuasive for purposes of meeting BW-3 Akron's burden on the element of breach with respect to ROFR. Kevin Bord has no independent knowledge of any of the facts asserted in paragraph 6 of the October 17th letter and Jim Disbrow, like William Bord, is now deceased. (*See* BWW Mot. at 3765.) In fact, given Kevin Bord's testimony, a reasonable jury could conclude that William Bord's frustrations between 1992 and 1997 actually led to a mutual decision, expressed in the October 17th letter, to change some of the provisions in the original Agreement. Kevin Bord was unaware of whether his father ever responded to that letter. (K. Bord Dep. at 1984.) There is

---

[19] Robert Pipoly, the franchisee of two BWW restaurants, including the Streetsboro restaurant that opened in 2004, has filed his affidavit, wherein he provides facts suggesting that the Bords never had any problem with the opening of that store. (*See* R. Pipoly Aff. [Doc. No. 78-5] ¶ 4 ("I spoke to [Bill Bord] about, among other things, my experiences with *both* of my BWW restaurants." (emphasis added)); ¶ 6 ("In or around March 2004, when the Streetsboro Restaurant opened, Kevin Bord called me on the phone to congratulate me on the store opening."); ¶ 7 ("About 6-7 years ago, . . . [m]any franchisees from Northeast Ohio attended [a meeting at the Medina restaurant], including Bill Bord, Ed Yaskowitz (the franchisee for the Austintown, Ohio store in Mahoning County), and I.").)

[20] Edward Yaskowitz, the franchisee of four BWW restaurants, including the Austintown restaurant that opened in 2000, has also filed his affidavit. (*See* E. Yaskowitz Aff. [Doc. No. 78-4] ¶ 9 ("At no point in my discussions or interactions with Bill Bord did he express an interest in opening a BWW store in Mahoning County. Likewise he never told me that he objected to my opening BWW restaurants in Mahoning County."); ¶ 10 ("I also know Bill Bord's brother and business partner, Fred Bord. Fred Bord resides in the Austintown area, which is the town where the BWW restaurant that I opened in 2000 is located.").)

nothing else in the record to suggest whether any of these changes were formalized. Mr. Redman testified that he has no recollection about there being any follow up from either side (D. Redman Dep. at 2097), nor did he have any reason to disbelieve what is stated in paragraph 6, although he had no firsthand, or independent, knowledge and had not discussed it with William Bord. (*Id.* at 2097-98.)

The Court concludes that BW-3 Akron is unable to establish a breach of the ROFR and, therefore, BWW's argument regarding the element of damages need not be addressed. Counterclaim I fails and BWW is entitled to summary judgment on that counterclaim.

### III. CONCLUSION

As set forth herein, BW-3 Akron's motion for summary judgment (Doc. No. 58) on the claims of Buffalo Wild Wings, Inc. in the first amended complaint is **denied**, and Buffalo Wild Wings Inc.'s motion for summary judgment (Doc. No. 59) on BW-3 Akron's three amended counterclaims is **granted**.

The Court will discuss with counsel, during the final pretrial conference, how to address Count I. The Court will proceed to trial on Counts II and III (Lanham Act claims) on December 4, 2017, pursuant to the Case Management Plan and Trial Order (Doc. No. 29), as modified by the non-document orders of October 3, 2017, October 24, 2017, November 3, 2017, and November 6, 2017. All of BW-3 Akron's counterclaims are dismissed.

**IT IS SO ORDERED**.

Dated: November 14, 2017

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**